**WO**

KAB

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

David Quintin Melendez,

Plaintiff,

v.

Centurion Healthcare, LLC, et al.,

Defendants.

No. CV-23-02534-PHX-SHD (DMF)

**ORDER**

Plaintiff David Quintin Melendez, who is currently confined in the Arizona State Prison Complex-Lewis, brought this civil rights action pursuant to 42 U.S.C. § 1983 and Arizona state law.    Pending before the Court are: (1) Defendant NaphCare and Neiswonger's Motion for Summary Judgment (Doc. 146), (2) Defendant Gann's Motion to Dismiss (Doc. 185), and (3) Defendants Centurion, Pippins, Stewart, and Tripp's Motion for Summary Judgment (Doc. 198).  Plaintiff was informed of his rights and obligations to respond (Doc. 148, 155, 199), and he opposes the Motions.  (Doc. 182, 201, 210.)

**I.    Background**

In his First Amended Complaint, Plaintiff alleges that, while in the custody of the Arizona Department of Corrections, Rehabilitation and Reentry (ADCRR), he was denied a necessary urgent surgery after he fractured his finger, was thereafter denied a corrective surgery and necessary physical therapy, and other medical care relating to his injury was unnecessarily delayed.  Plaintiff alleges that, as a result, he has lived with unnecessary pain and has a deformity and loss of function in his hand.

On screening Plaintiff's First Amended Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment medical care claims in Count One against Defendants Centurion, NaphCare, Stewart, Tripp, Neiswonger, Utilization Management Team[1] member Pippins, and Gann; a state law claim for medical malpractice and negligence against Defendant Stewart in Count Two; a state law claim for medical malpractice and negligence against Defendant Tripp in Count Three; and a state law claim for medical malpractice against Defendant Centurion in Count Four based on respondeat superior.  (Docs. 7, 79, 115.)

## II.     Gann's Motion to Dismiss

Gann asserts that he should be dismissed because he was only sued in his official capacity and therefore could only provide injunctive or declaratory relief, but Gann no longer works for the Arizona Department of Corrections, Rehabilitation, and Reentry, so he is incapable of providing any relief.  Gann further asserts that substituting the person who holds his former position "will not cure the defect because the relief Plaintiff seeks is legally impossible."  (Doc. 185 at 1.)  In Response, Plaintiff agrees that Gann should be dismissed. (Doc. 210.)  Accordingly, Defendant Gann's Motion to Dismiss will be granted and Defendant Gann will be dismissed from this action without prejudice.

## III.    Motions for Summary Judgment

### A.     Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The

---

[1] When Centurion provided medical care to ADCRR prisoners, it maintained a Department entitled "Utilization Management."  *See, e.g.*, *Jensen v. Shinn*, 609 F. Supp. 3d 789, 804 (D. Ariz. 2022), *amended,* No. CV-12-00601-PHX-ROS, 2022 WL 2910835 (D. Ariz. July 18, 2022).  Referrals for medical care were processed through the Utilization Management Department, which did "not examine or evaluate the prisoner but based on the medical records, it look[ed] at the clinical indication to make sure [the recommended treatment was] appropriate." *Id.* (internal citation omitted).  Utilization Management either approved the treatment or recommended an "alternative treatment plan." *Id.*

movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**B.    Facts**

**1.    Initial Injury**

On December 7, 2021, Plaintiff submitted a Health Needs Request (HNR) stating "Door slammed on my pinky and it's probably broken." (Doc. 196-5 at 2.) In Response, Plaintiff was seen by Registered Nurse (RN) Bautista the same day. (Doc. 196-6 at 3.) Plaintiff's right hand was swollen and bruised and he reported his pain as 8/10. (*Id.* at 3.) Bautista put Plaintiff on the "provider line" so that he could be seen by a doctor or nurse

practitioner, gave him a prescription for Tylenol #3 (one tab twice daily for 6 days), ordered x-rays, and prescribed ice for 3 days and an ace wrap.  (*Id.* at 7-8.)

On December 8, 2021, Plaintiff's x-ray results were processed and showed a "5th metacarpal fracture with malalignment."  (*Id.* at 14.)  On December 9, 2021, Plaintiff submitted an HNR stating "yesterday I received a xray exam, and it showed a fracture on my right hand, which is in pain and needs perhaps be put in a splint?  Thank you for time and help with this matter." (Doc. 196-4 at 2.)  On December 10, 2021, Plaintiff saw Dr. Warren, who noted that Plaintiff's x-ray results showed a 5th metacarpal fracture with malalignment. (*Id.* at 15.)  The plan notes from this visit state "referral to hand surgery if greater than 30%" and "splint." (*Id.* at 17.)  Dr. Warren advised Plaintiff to elevate his hand to reduce swelling.  (*Id.*)

On December 11, 2021, Plaintiff submitted an HNR stating "I have a broken hand, and the provider advised me that I would receive a SNO [Special Needs Order] for no heavy lifting or writing.  Im [sic] in tremendous pain; need to be placed on nurse line." (Doc. 196-5 at 2; Doc. 184 at 13.)  The next day, Plaintiff was seen by RN Bautista, who noted ongoing swelling and bruising of fractured right hand and throbbing pain at a level of 7/10.  (Doc. 196-5 at 21.)  RN Bautista issued an SNO with a three-day duration for "no lifting, pulling, pushing, writing," and referred Plaintiff to a medical provider to be seen within 14 days.  (*Id.* at 25-26.)

On December 17, 2021, Plaintiff was seen by NP Armendariz, who noted that Plaintiff was in pain, was unable to straighten his 5th finger, was wearing a splint, and works as a barber.  (*Id.* at 29.)  On examination, Plaintiff was unable to straighten his 4th and 5th metacarpals.  (*Id.* at 30.)  NP Armendariz noted she would staff an orthopedic consult with Defendant Dr. Stewart.  (*Id.* at 33.)

On December 18, 2021, Plaintiff submitted an HNR stating:

> Nurse, I am in a great deal of pain due to my broken right hand (8/10).  NP Armendiaz put in for a hand specialist.  I do not want my hand to set wrong, please have x-rays reviewed.  I need something for swelling and pain, unable to use hand. Please see if Dr. Bibeu from Centurion at SMU can review for

> future therapy.  I do not want permanent damage to my writing
> hand, please do not let me loose [sic] my ability to write and
> work in the future, upon my release from prison.  thank you.
> Re[s]pectfully

(Doc. 196-5 at 2.)  On December 18, 2021, Nurse Pissarenko placed Plaintiff on the nurse line.  (*Id.* at 4.)  On December 19, 2021, Plaintiff saw RN Jones in response to his HNR; she placed Plaintiff on the provider line to be seen within 14 days.  (*Id.* at 42.)

On January 5, 2022, Plaintiff saw NP Armendariz and reported a great deal of pain due to his broken right hand.  (Doc. 184 at 17.)  Plaintiff asked "if Dr. Bibeu from Centurion at SMU can review for future therapy."  (*Id.*)  Plaintiff stated "I do not want permanent damage to my writing hand, please do not let me lo[]se my ability to write and work in the future."  (*Id.*)  Plaintiff reported issues with writing and tying his shoes.  (*Id.*)  Armendariz ordered an x-ray of Plaintiff's right hand and placed a consult for a hand surgeon per Defendant Dr. Stewart.  (Doc. 196-5 at 49.)  This x-ray showed "no significant change in the previously described fracture of the 5th metacarpal."  (*Id.* at 77.)  Armendariz also submitted a request for a hand surgery consult after consulting with Dr. Stewart.  (Doc. 184 at 17.)

On January 14, 2022, an urgent appointment was scheduled at Arizona Center for Hand to Shoulder Surgery.  (Doc. 196-9 at 4.)

### 2.    The Specialist Visit and Surgery Recommendation

On January 27, 2022, Plaintiff was seen by Physician Assistant-Certified (PA-C) Leipus at the Arizona Center for Hand to Shoulder Surgery.  (Doc. 196-10 at 2.)  Leipus noted the options discussed with Plaintiff were "conservative management in which we do no repair and he has a deformity and severe lack of function in his small finger" or "operative management for open reduction internal fixation and extensor tenolysis."  (*Id.*)  Plaintiff agreed to surgery and Leipus wrote patient "needs surgery ASAP."  (Doc. 184 at 20.)  After Plaintiff returned from the off-site appointment, he saw RN Jones, who noted Plaintiff was returning from the Arizona Center for Hand Surgery "with recommendation for SURGERY ASAP AND POST OP 2 WEEKS."  (Doc. 196-6 at 52-53 (emphasis in original).)  RN Jones placed Plaintiff on the provider line.  (Doc. 196-6 at 53.)

### 3.      Denial of Surgery and Ongoing Complaints

On January 28, 2022, Defendant Dr. Tripp noted "hand surgery consult reviewed. Recommendations included . . . surgery.  ORIF. or [sic] conservative management with deformity.  The patient wanted to proceed with surgery.  I will refer this to the medical director for decision."  (*Id.* at 60.)  This referral was given to Dr. Stewart.  (Doc. 184 at 37-38.)  At no time did Dr. Stewart personally examine Plaintiff.

On April 13, 2022, Plaintiff had a telemedicine appointment with Physician Assistant (PA) Racowsky and complained of "hand pain and deformity from a fracture of 5th metacarpal."  (Doc. 196-6 at 66.)  Racowsky noted "S/P fracture of 5th metacarpal with partial movement and deformity noted."  (*Id.* at 68.)  Racowsky did not address Plaintiff's complaints of pain in the medical plan.  (*Id.*)  On May 17, 2022, Plaintiff saw NP Lah, who noted on exam "[r]ight distal fifth metacarpal noted with slight swelling."  (*Id.* at 77.)  Lah continued Plaintiff's current "plan of care."  (*Id.* at 80.)

On May 30, 2022, Plaintiff submitted an Informal Complaint Resolution to the Assistant Director of Nursing explaining his ongoing extreme pain from his fracture.  (Doc. 184 at 46.)  On June 6, 2022, Defendant Neiswonger[2] responded that Plaintiff was seen on the nurse line on June 16 and a referral was made to the medical provider for follow up.  (*Id.* at 63.)

On June 15, 2022, Plaintiff submitted an HNR stating:

> Nurse, Please call me in to examine and help fix my right small finger [i]t really hurts like a 8 out of 10 in pain level.  I can't hold or pick up stuff without it hurting worse, even getting dressed, tying my shoes is worst. I need to know some hand exercises and maybe an NP's advice so I don't suffer permanent damage.  Please help Thank you.

(Doc. 196-6 at 80.)  On June 15, 2022, Nurse Aguirre placed Plaintiff on the Nurse's line. (Doc. 196-4 at 6.)  On June 16, 2022, Plaintiff saw RN Jones and reported pain ranging from 6-9/10 in his right pinky and ring finger radiating to his right shoulder.  (Doc. 96-6 at

---

[2] Defendant RN Neiswonger was the Assistant Director of Nursing.  (Doc. 147 at 2 ¶ 7.)

84.) Jones noted that Plaintiff had no controlled movement in right pinky finger and ring finger and "[c]onsult from 1/2022 states needs surgery, unable to see if follow up completed." (*Id.*) Jones placed Plaintiff on the provider's line to be seen within 14 days. (*Id.* at 88.)

On June 25, 2022, Plaintiff was seen by NP Avant-Ortiz via telemedicine. (*Id.* at 92.) Avant-Ortiz scheduled Plaintiff for an "urgent consult to hand surgery. (*Id.* at 96.)

On June 28, 2022, Plaintiff saw NP Zokvic who noted that Plaintiff's hand is now disfigured and he is unable to lay his hand flat on the desk without pain, his fifth metacarpal knuckle is misplaced and there is edema in the palm of his hand. (Doc. 196-6 at 98.) Plaintiff reported pain 10/10. (*Id.*) Zokvic noted "requested Hand Surgery F/U for evaluation of treatment." (*Id.* at 102.)

On July 21, 2022, Plaintiff showed Defendant Neiswonger his disfigured hand and told Neiswonger he could not even tie his shoes. (Doc. 184 at 3 ¶ 8.)

On July 25, 2022, Plaintiff received a grievance response authored by Stacey Fife stating, in January, the surgeon's notes "included" recommendations for surgery or conservative management and the "the surgeon recommendations were reviewed by [U]tilization review and conservative management was determined appropriate at that time." (Doc. 184 at 61.)

On July 27, 2022, Plaintiff submitted an HNR complaining of unbearable pain from his "deformed" hand traveling up his forearm and into his shoulder. (*Id.* at 8.) The response, signed with an illegible signature, indicates Plaintiff was placed on the nurse's line. (*Id.*) The same day, Plaintiff submitted an HNR stating:

> my right pinky looks like a broken crooked twizzler. my right hand is my dominant hand. everything I do from brushing my teeth to eating with a spoon causes me pain and discomfort. I submitted a paper HNR yesterday and I have not been seen yet.

(Doc. 196-5 at 2.) Nurse McAdams noted that Plaintiff was scheduled for the nurse's line. (Doc. 196-4 at 9.)

On July 27, 2022, Plaintiff saw RN Jones due to unbearable pain in his hand,

migrating to his shoulder.  (*Id.* at 104.)  In the plan notes, Jones wrote provider line/nurses line as needed.  (Doc. 196-6 at 112.)

### 4.    Return to the Specialist

On July 28, 2022, Plaintiff again saw PA-C Leipus at the Arizona Center for Hand Surgery.  (Doc. 196-10 at 8.)  She wrote that although Plaintiff was supposed to have surgery January, "unfortunately, it was never set up."  (*Id.*)  On exam, she noted "mild dorsal deformity on the ulnar aspect of the hand over the fifth metacarpal fracture, a mild amount of swelling on the small finger, tenderness to palpations directly over the fracture site and the surrounding area, notably into the PIP joint, throughout the forearm musculature, at the medial aspect of the elbow, and throughout the entire upper arm, and slight extensor lag in the small finger."  (*Id.* at 8-9.)  Leipus wrote that there were two options: "occupational therapy for range of motions, edema control, stretching and strengthening and other physical therapy modalities, which possibly could allow better function of his hand or surgical management, including corrective osteotomy, tenolysis/capsulotomy as needed."  (*Id.* at 9.)  Leipus explained to plaintiff that "surgery is not time sensitive **like it was in the subacute phase of his fracture**."  (*Id.* (emphasis added).)  On July 28, 2022, Plaintiff saw RN Jones on his return from Arizona Center for Hand Surgery.  (Doc. 196-6 at 115.)  RN Jones noted recommendations for Tylenol PM, ibuprofen and ice packs as needed and occupational therapy for range of motion, stretching and strengthening.  (*Id.*)  She noted "[i]f therapy fails will discuss surgery for corrective osteotomy/tenolysis."  (*Id.*)

On August 5, 2022, Plaintiff saw NP Zokvic for a follow-up based on the recommendation of the surgeon to follow-up after two months of a home exercise program; Plaintiff reported "tremendous pain" with exercises in his neck and hand and severe tingling in his wrist to elbow.  (*Id.* at 123.)  On exam, Plaintiff has no movement in his pinky, severe arthritic changes in lateral hand, and limited range of motion with flexion and extension.  (*Id.* at 123-124.)  Although Tramadol was recommended, Plaintiff was given an alternate treatment plan of Lyrica.  (*Id.* at 127.)  NP Zokvic noted that Plaintiff

had received no treatment for fracture in December 2021 and requested hand physical therapy. (*Id.*) The request for physical therapy was approved. (Doc. 196-9 at 8-9.) Plaintiff was scheduled for physical therapy on August 18, 2022 and October 4, 2022. (*Id.* at 10, 13.) At the August 18, 2022 physical therapy appointment, the physical therapist noted "best treatment may be surgical intervention but trial of therapy to [range of motion]." (Doc. 196-10 at 12.)

On August 30, 2022, Plaintiff submitted an HNR stating "Due to the pain from my deformed pinky, I am requesting you renew my medication." (Doc. 196-6 at 13) In Response, on August 31, Kilosky responded that a renewal request was submitted. (Doc. 196-4 at 10.)

On September 19, 2022, a request for Plaintiff see the hand surgeon was approved. (Doc. 196-9 at 11.)

### 5. NaphCare and Ongoing Complaints

NaphCare took over as the medical provider to prisoners in ADC custody on October 1, 2022. (Doc. 147 at 2 ¶ 6.)

On October 4, 2022, Plaintiff again saw PA-C Leipus. (Doc. 147 at 62.) On exam, Leipus noted "dorsal deformity over the fifth metacarpal fracture site," "tenderness to palpitation in this area, but also throughout the small finger at the PIP joint that extends to the ulnar aspect of the hand risk with pain throughout the forearm, medial elbow, and upper arm. (*Id.*) Plaintiff had 50 degrees fixation at the MCP Joint. (*Id.*) PA-C Leipus discussed surgical management of a corrective osteotomy and tenolysis/Capsulotomy at the MCP joint, but noted that Plaintiff would have to be able to consistently go to occupational therapy after the surgical procedure. (*Id.* at 67.) PA-C Leipus found the likelihood that this would be provided pretty low given that Plaintiff was not given the full extent of the occupational therapy that she had previously ordered. (*Id.*) Leipus noted that if Plaintiff "does not get into occupational therapy after surgery, he will again develop scar tissue leading to stiffness at the MCP joint." (*Id.* at 67-68.) Leipus told Plaintiff he could wait until he got out of prison in two years to ensure that he could get consistent, aggressive

physical therapy following the surgery.  (*Id.* at 68.)  Leipus placed another order for "occupational therapy to work on progressive range of motion, stretching, strengthening and other modalities they see fit to try to improve the function of the hand."  (*Id.*)  In her note, Leipus wrote that Plaintiff only got one physical therapy session in the last two months, "[w]e should only do surgery if [Plaintiff] can have consistent therapy.  [Plaintiff] elects to wait on surgery until he is released [in] 2 years.  Rec[ommend] keeping joints supple with therapy meanwhile."  (*Id.* at 64.)  On return from seeing PA Leipus, Plaintiff saw RN Hernandez, who took note of Leipus's recommendations.  (*Id.* at 67.)

On October 13, 2022, Dr. Stewart stated Plaintiff had a change of heart and wanted to have the surgery due to worsening severity of pain; Dr. Stewart said he discussed the request and consult with clinical coordinators.  (*Id.* at 73.)

On October 18, 2022, Plaintiff submitted an HNR to Defendant Neiswonger stating "Per our conversation on 10/14/22, I am attaching my inmate letter [to address] extreme pain due to a malaligned [sic] healed fracture."  (Doc. 184-1 at 18.)  In Response, Plaintiff was placed on the nurses line.  (*Id.*)  Plaintiff also wrote an inmate letter to Defendant Neiswonger explaining that he needs corrective surgery due to constant pain, but needs an assurance that he will receive the required physical therapy thereafter.  (*Id.* at 19.)

On October 20, 2022, Plaintiff was seen in medical by Jonna Jones and reported that the surgeon told him he needed surgery and that he must have aggressive physical therapy in order to properly heal and to have full use of his right hand.  (Doc. 147 at 105.)  Jones placed Plaintiff on the provider line.  (*Id.*)

On October 26, 2022, Plaintiff saw NP Duarte in medical in response to an HNR in which Plaintiff stated "I have pain 7/10 in my right hand, I need surgery and aggressive PT afterwards."  (*Id.* at 103.)  Duarte noted that an appointment with the hand surgeon for "surgical repair" was scheduled for November 2, 2022, a consult was submitted for right hand physical therapy five times weekly after hand surgery, and Plaintiff's pain medications of Tramadol, meloxicam, and acetaminophen were continued.  (*Id.* at 103-104.)  Duarte submitted a request for right hand PT 5 times weekly after 5th right metacarpal

fracture surgical repair, but it was later "cancelled" because "PT not ready to go forward at this time per ortho." (Doc. 184-1 at 29-30.)

On November 8, 2022, Plaintiff saw PA-C Leipus. (Doc. 184-1 at 32.) Leipus noted that Plaintiff had a fifth metacarpal malunion fracture and reports increasing right small finger and hand numbness that has progressively gotten worse. (*Id.*) On exam, Plaintiff had a malunion site with a palpable dorsal nodule that is very tender to palpitation, tenderness at the MCP joint of the small finger but not through the rest of the finger, minor tenderness along the third and fourth metacarpals, numbness on the ulnar and radial aspect of the small finger and ulnar palmar aspect of the hand, tenderness to palpitation at the medial epicondyle of the elbow and subluxation of the ulnar nerve on range of motion. (*Id.*) She recommended an Electromyography (EMG)[3] due to the numbness in Plaintiff's right hand to rule out compression of the ulnar nerve. (*Id.* at 33.) With regard to the recommended surgery, she wrote that ADCRR stated Plaintiff would only be able to attend aggressive occupational therapy three times per week, but Plaintiff would need such therapy five times a week for the first two to three weeks after surgery. (*Id.* at 33.) She wrote that because ADCRR could not provide the appropriate level of care, Plaintiff "does not feel comfortable going forward with the surgery," but Plaintiff asked Leipus to please discuss the necessary physical therapy five times per week with ADCRR again. (*Id.*)[4] NP Duarte reviewed the notes on Plaintiff's return and ordered an EMG. (Doc. 147 at 128.)

On December 2, 2022, Plaintiff had the EMG. (*Id.* at 142.)

On December 9, 2022, Plaintiff was seen by NP Duarte in medical as a follow up to his EMG. (*Id.* at 98.) Duarte noted "stable" right wrist pain and that Plaintiff's EMG was normal. (*Id.* at 99.)

---

[3] An EMG "is a diagnostic procedure to assess the health of muscles and the nerve cells that control them (motor neurons). EMG results can reveal nerve dysfunction, muscle dysfunction or problems with nerve-to-muscle signal transmission." *See* Mayo Clinic Tests and Procedures, *Electromyography*, available at https://perma.cc/UU3U-N8VM.

[4] Notably, Defendants did not provide the records from this visit with their Motion for Summary Judgment.

On December 20, 2022, Plaintiff saw PA-C Leipus.  (*Id.* at 149.)  She reviewed Plaintiff's EMG and offered him a steroid injection.  (*Id.*)[5]  On January 18, 2023, NP Duarte noted that Plaintiff was to use tennis ball twice weekly for right hand PT.  (*Id.* at 98.)

On January 18, 2023, NP Duarte wrote that Plaintiff was to use tennis ball twice weekly as needed for right hand PT.  (*Id.* at 163.)   The records indicate that Plaintiff was given a tennis ball for PT twice a week between January 19, 2023 and April 20, 2023.  (*Id.* at 165-66.)

On February 4, 2023, Plaintiff saw RN Fabian and reported that he felt a sharp pain in his right trapezius four days ago and it hurts when he lifts or rotates his arm.  (*Id.* at 168.)  On exam, Plaintiff reported pain 5/10 with shoulder rotation and when lifting his arm.  (*Id.* at 173.)  Fabian noted "weak grip on right hand[; patient] on therapy for that issue."  (*Id.*)  Plaintiff was sold ibuprofen from the commissary, given 3 days "no duty," and was advised to do stretching exercises.  (*Id.* at 174.)

On March 21, 2023, Plaintiff submitted an Inmate Informal Complaint Resolution addressed to the Assistant Director of Nursing explaining the history of his fracture, that he had been wrongfully denied surgery, and that he still needs surgery.  (*Id.* at 38.)

On April 11, 2023, Plaintiff was seen by Nurse Aguirre and cleared for transfer to the Central Detention Unit.  (*Id.* at 95-96.)

On April 21, 2023, Plaintiff was seen by Monroe in medical after he was transferred to a new unit.  (*Id.* at 94.)  She noted a visible deformity on Plaintiff's right hand due to a 1-year old injury and wrote "Pt. to use tennis ball in medical as physical therapy once a week."  (*Id.*)

On April 22, 2023, Plaintiff was seen by Ringer in Medical after Plaintiff submitted an HNR requesting a lower bunk due to his hand deformity and inability to jump on the top bunk.  (*Id.* at 93.)  Ringer put Plaintiff on the provider line.  (*Id.* at 94.)

---

[5] The Court could not locate the medical records from the specialist visit. Defendants submitted only the provider summary on Plaintiff's return to the prison.  It is unclear from these notes whether Plaintiff was given a steroid injection.

On May 4, 2023, Plaintiff saw Dr. Leeds and complained of persistent pain in his right hand with pain level constant 6-8/10 with sharp pain. (*Id.* at 92.) Leeds wrote "[r]ecords note patient had been sent to the hand specialist who recommended conservative management if patient could not get the aggressive PT/OT after surgery and conservative measures were favored by patient according to the records." (*Id.*) Plaintiff complained that his pain was not controlled in between Tramadol doses and Leeds recommended Methocarbamol for breakthrough pain and ordered an x-ray to check for bone disease/fracture. (*Id.* at 93.) Leeds prescribed Methocarbamol for breakthrough pain and ordered an x-ray to check for bone disease/fracture. (*Id.* at 188.)

On June 1, 2023, Plaintiff saw "medical provider" Begner and requested a tennis ball for self-guided physical therapy of his hand. (*Id.* at 91.) Plaintiff asked "multiple times if [Begner] could guarantee absolute outcome of 5 days PT if surgery were to be the recommended from an offsite referral at which point [Begner told Plaintiff] not being the authoritative decision maker as [to] specialists, PT and [U]tilization [M]anagement are all part of the process [sic]." (*Id.* at 91.) In the plan of care, Begner wrote that Plaintiff's pain management would continue and "[r]ecommendations from previous visits re-told to pt." (*Id.* at 92).

On October 4, 2023, Plaintiff saw NP Thomas for his annual physical and reported high pain in his right hand from his past broken pinky. (*Id* .at 89.) NP Mattson approved Plaintiff's prescription for Tramadol between October 8, 2023 and October 25, 2023. (*Id.* at 204.)

On October 12, 2023, Plaintiff saw NP Thomas and relevantly reported a high pain level in his pinky with burning and numbness; he requested a renewal of Tramadol. (*Id.* at 88.) Thomas renewed Plaintiff's Tramadol. (*Id.* at 89.)

On October 18, 2022, Plaintiff saw NP Zokvic for a chronic care visit. (*Id.* at 75.)

On November 17, 2023, NP Olmstead made a note in Plaintiff's chart indicating that Plaintiff had been transferred to a new yard and was on opiates for chronic pain; she wrote that he needed a provider assessment to reevaluate his pain and medication, that

Plaintiff's hand was reinjured during transport and he was seeking a renewal of his pain medication. (*Id.* at 85-86.) On exam, Plaintiff had a bony deformity to dorsum of 5th metacarpal, limitations in flexion at MCP, PIP and DIP joint, could not fully extend his 5th digit, and had pain on palpitation. (*Id.* at 86.) The plan was to continue Tramadol and add Tylenol. (*Id.* at 86.)

On May 10, 2024, Plaintiff was seen by Sharon Joshua; Plaintiff stated that he had been on Tramadol for two years and it has become ineffective. (*Id.* at 83.) Plaintiff explained that he had continued chronic right hand pain due to his finger deformity. (*Id.*) On exam, Plaintiff's pinky was permanently flexed. (*Id.* at 83.) The plan was to continue Plaintiff on his current treatment plan. (*Id.*)

Plaintiff continues to suffer from pain every day and has difficulty performing tasks, including writing or opening doors and cannot fully close his hand. (Doc. 184 at 3 ¶ 9.)

**C.    Discussion**

  **1.    Eighth Amendment Claim (Count One)**

    **a.    Legal Standard**

Under the Eighth Amendment, a prisoner must demonstrate that a defendant acted with "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective prong and a subjective prong. First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at

1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; to satisfy the knowledge component, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corrs.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105. Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096.

Moreover, to support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012) (extending the "official policy" requirement for

municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), to private entities acting under color of law).  Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury.  *See Monell*, 436 U.S. at 691-94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

### b.    Pippins

Defendant Pippins argues that she is entitled to summary judgment because Plaintiff's claim against her is based on Plaintiff's mistaken belief that she had a role on the Utilization Management Team and was involved in the decision to deny Plaintiff's hand surgery consult.  She asserts that she is not a member of the Utilization Management Team and had no role in submitting, approving, or denying outside consult requests.

Tiffany Pippins was an LPN for Centurion at ADCRR, which included the Eyman Complex, from 2021 until September 30, 2022.  (Doc. 196 ¶ 12.)  Plaintiff asserts that Pippins reviewed Plaintiff's medical record on "several occasions" citing to his January 28, 2022 and June 25, 2022 medical records.  (Doc. 202 at 2 ¶ 12.)  Those records indicate that Pippins reviewed the records to see if there was a pending nurses order.  (Doc. 202-1 at 3, 5.)  Pippins testified that she reviewed Centurion provider/nursing records to complete her duties as an LPN, which did not ever involve any decision making by the Utilization Management Team or submitting or addressing consult requests in any way and she only logged in to review Plaintiff's records if there was a pending nurses order, but would not have been responding to or addressing Dr. Tripp's hand surgery review notes.  (Doc. 196 ¶ 31.)

Plaintiff does not present any evidence disputing that Pippins had no substantive role in providing him medical care and had no authority to grant or deny a surgery request. There is no evidence in this record that Pippins' review of doctor's notes in Plaintiff's records on two occasions was deliberately indifferent to Plaintiff's serious medical needs.

- 16 -

1    Accordingly, summary judgment will be granted in favor of Defendant Pippins as to

2    Plaintiff's Eighth Amendment claim in Count One.

3                **c.**    **Tripp**

4          Defendant Tripp argues that he is entitled to summary judgment because he was not

5    deliberately indifferent to Plaintiff's serious medical needs when he recorded the

6    recommendations from the specialist into Plaintiff's medical records, even if he did not

7    accurately note those recommendations, this isolated incident does not establish deliberate

8    indifference, and Defendant Tripp had no direct encounters or any further role regarding

9    Plaintiff's fractured pinky.

10         On return from Plaintiff's appointment with the specialist, Dr. Tripp noted in the

11    medical record "hand surgery consult reviewed.  Recommendations included . . . surgery.

12    ORIF. or [sic] conservative management with deformity.  The patients wanted to proceed

13    with surgery.  I will refer this to the medical director for decision."  Tripp correctly wrote

14    that the options provided by the specialist were either surgery or that Plaintiff would have

15    a deformity if he did not get the surgery and he forwarded the request to Stewart and the

16    Utilization Management Committee for a decision.  There is no evidence in the record that

17    Tripp had any other involvement in Plaintiff's medical care.  On this record, there is no

18    evidence that Tripp was deliberately indifferent to Plaintiff's serious medical needs when

19    he forwarded the specialist's surgery recommendation to others with the authority to

20    approve the surgery.   Accordingly, summary judgment will be granted in favor of

21    Defendant Tripp as to the Eighth Amendment claim in Count One.

22                **d.**    **Stewart**

23          Defendant Stewart asserts that he was not deliberately indifferent to Plaintiff's

24    serious medical needs when he "concluded that a hand surgery was not medically necessary

25    and would be considered elective." (Doc. 198 at 13.)  Defendant Stewart argues that his

26    disregard of the specialist's opinion was merely a difference of opinion that is not

27    actionable.  Defendant Stewart also argues that because Plaintiff received some care,

28    Stewart could not have been deliberately indifferent.

Defendant Stewart does not dispute that Plaintiff had a serious medical need.  On examination of Plaintiff's injury, the specialist, PA-C Leipus, noted that Plaintiff had two options, the first, she labeled "conservative management" although there was no treatment involved in this option and she said it consisted of "no repair and he has a deformity and severe lack of function in his small finger."[6]  And the second option was "operative management for open reduction internal fixation and extensor tenolysis."  When Plaintiff opted for the surgery, PA-C Leipus considered it urgent.  Despite this urgency, Dr. Stewart, who never examined or directly treated Plaintiff, and Centurion's Utilization Management Team made the decision for conservative treatment, which, in this context, meant *no treatment* of the injury and that Plaintiff would have to live with a deformity and a severe lack of function in his finger.  The medical records establish that Plaintiff indeed had a deformity, significant pain, and severe lack of function in his finger when he did not get the surgery.  A reasonable jury could conclude that this decision was deliberately indifferent to Plaintiff's serious medical needs.  *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs); *see also Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) ("[a] jury could infer deliberate indifference from the fact that [the doctor] knew the extent of [the prisoner's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [the prisoner's] situation").  Likewise, as discussed more fully below, a reasonable jury could conclude that Dr. Stewart's failure to assure Plaintiff that he could receive the proper physical therapy after the subsequent specialist

_____

[6] Defendants' contention that "the [specialist's] record did not state whether surgical intervention was better than conservative management, or a [sic] that surgery was urgent" (Doc. 196 ¶ 26) is an improper attempt to obtain summary judgment upon a misrepresentation of the Record.

recommendations for surgery was the result of deliberate indifference to Plaintiff's serious medical needs.

Dr. Stewart asserts that he determined that hand surgery was not medically necessary at the time, but Dr. Stewart does not support this assertion with a substantive medical opinion and, as stated, he never personally examined Plaintiff. His contention that he simply disagreed with PA-C Leipus or that he was more qualified than her to determine whether Plaintiff needed surgery are likewise unsupported. Dr. Stewart does not substantively address PA-C Leipus' findings, made after actually examining Plaintiff, that Plaintiff would suffer deformity and loss of function without an urgent surgery, but rather gives conclusory testimony regarding pinky fractures in general.

Moreover, Dr. Stewart's contention that he was somehow more qualified to determine whether surgery was necessary than PA-C Leipus is unsupported by any substantive medical opinion, is contradicted by the decision to send Plaintiff to PA-C Leipus in the first instance, and is further undermined by the facts that Dr. Stewart never actually examined Plaintiff's injury and that Dr. Stewart is not an orthopedic specialist.

Defendant Stewart's argument that he could not have been deliberately indifferent to Plaintiff's serious medical needs because Plaintiff received some care is likewise unavailing. *See, .e.g.*, *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (a prisoner does not have to prove that he was completely denied medical care to support a claim of deliberate indifference to serious medical needs).

In short, there are disputed issues of material fact from which a jury could reasonably conclude that Stewart was deliberately indifferent to Plaintiff's serious medical needs and Stewart has not met his burden of establishing otherwise. Stewart will therefore be denied summary judgment as to Count One.

### e.    Centurion

Defendant Centurion argues that it is entitled to summary judgment because Plaintiff cannot establish that any alleged constitutional violation was the result of a policy, practice, or custom of Defendant Centurion.

1      Drawing all inferences in Plaintiff's favor, Centurion's Utilization Management
2 Team and Dr. Stewart denied Plaintiff a medically necessary urgent surgery despite the
3 specialist's warning that Plaintiff would suffer an ongoing deformity and loss of function
4 in his hand without the surgery.  Numerous medical providers appear to have deliberately
5 misconstrued the specialist's medical records regarding the surgery and falsely indicated
6 that the specialist indicated that doing nothing was an acceptable "alternate" to surgery.
7 (*See, e.g.*, Doc. 184 at 61 (July 25, 2022 grievance response authored by Stacey Fife stating,
8 in January, the surgeon's notes "included" recommendations for surgery or conservative
9 management and the "the surgeon recommendations were reviewed by [U]tilization review
10 and conservative management was determined appropriate at that time.").

11      When Plaintiff was returned to the specialist in July, the specialist wrote that
12 although the surgery was no longer time sensitive, it would still be necessary, and in the
13 meantime, Plaintiff should have occupational therapy, including "edema control,
14 progressive range of motion, stretching, strengthening, home program, modalities,
15 splinting per therapist, work hardening 2-3 times per week for 8 weeks."  (Doc. 196-10 at
16 9.)  The specialist wrote that these were the two options.  The records demonstrate that
17 Plaintiff only had two physical therapy visits, and the physical therapist also opined that
18 the "best treatment may be surgical intervention."  (Doc. 196-10 at 12.)  Plaintiff was not
19 given either the surgery or the full course of recommended physical therapy under
20 Centurion.  A reasonable jury could conclude that numerous Centurion providers were
21 deliberately indifferent to Plaintiff's serious medical needs by repeatedly disregarding
22 specialist recommendations.

23      "Liability for improper custom may not be predicated on isolated or sporadic
24 incidents; it must be founded upon practices of sufficient duration, frequency and
25 consistency that the conduct has become a traditional method of carrying out policy."
26 *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  While one or two incidents are
27 insufficient to establish a custom or practice, the Ninth Circuit has not established what
28 number of similar incidents would be sufficient to constitute a custom or policy.  *See*

*Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)). But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual." *Id.* Whether actions by an entity's officers or employees amount to a custom "depends on such factors as how longstanding the practice is, the number and percentage of officials engaged in the practice, and the gravity of the conduct." *Mi Pueblo San Jose, Inc. v. City of Oakland*, C-06-4094 VRW, 2006 WL 2850016, at *4 (N.D. Cal. Oct. 4, 2006).

The evidence establishes that specialist recommendations were repeatedly ignored and Plaintiff was given an alternative treatment plan without medical basis. This evidence raises a disputed issue of material fact as to whether Centurion had a custom or practice in delaying or denying treatment recommended by specialists and deferring to an "alternative treatment plan" for non-medical reasons. A reasonable jury could conclude that these delays were not the exception to the policy, but the rule, and thereby constituted a custom or practice of deliberate indifference. *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1194-95 (9th Cir. 2002) (whether a policy or custom exists is normally a jury question). A reasonable jury could likewise conclude that it was this custom that resulted in the Eighth Amendment violations.

Accordingly, Centurion's Motion for Summary Judgment will be denied as to Count One.

### f.    Neiswonger and NaphCare

Defendant Neiswonger argues that he was not deliberately indifferent to Plaintiff's medical needs because Plaintiff was seen by a hand specialist on November 8, 2022, Plaintiff was receiving pain medication, and "Plaintiff refused to undergo surgical correction of his fractured finger." (Doc. 146 at 19.)

In Response, Plaintiff argues that (i) Neiswonger was aware of the seriousness of Plaintiff's injury in May 2022 because he personally reviewed the specialist's order for surgery and the warning regarding the negative outcome in the absence of surgery, (ii) Plaintiff showed Neiswonger his injury on July 21, 2022 and October 14, 2022 and had a lengthy discussion with Neiswonger on October 14 about Plaintiff's lack of hand functioning and continued pain, and (iii) despite that Neiswonger was the Assistant Director of Nursing and had the had the ability to intervene and guarantee Plaintiff would receive proper physical therapy following the surgery, Neiswonger failed to ensure that Plaintiff received the necessary surgery and the necessary physical therapy following surgery.

Defendant NaphCare argues it is entitled to summary judgment because Plaintiff's claim against NaphCare is based on the denial of aggressive physical therapy following surgery, but "Plaintiff refused to undergo surgical correction . . . [t]herefore, aggressive physical therapy post-surgery was not requested, required, approved, or denied." (Doc. 146 at 15.)

In Response, Plaintiff argues that in October 2022, the hand specialist stated that Plaintiff should not have surgery unless he could get the necessary physical therapy following the surgery, but despite this, NaphCare providers continually denied Plaintiff assurance that he would receive the necessary physical therapy post-surgery and although the specialist recommended occupational therapy, Plaintiff did not receive the recommended therapy, and NaphCare providers continued to misrepresent the surgery recommendations and failed to offer Plaintiff any legitimate opportunity to have the surgical procedure.

Drawing all inferences in Plaintiff's favor, when Plaintiff saw the specialist on October 4, 2022, she noted that Plaintiff had not been given the occupational therapy that she had ordered and she expressed doubts that Plaintiff could be given the necessary physical therapy while in prison given the prison medical providers' demonstrated refusal to follow her orders. She made clear that the surgery was still necessary, but would not be

successful without the appropriate physical therapy and that in the meantime, Plaintiff should have occupational therapy to keep his joints supple until he could have surgery.

On October 13, 2022, Dr. Stewart noted that Plaintiff wanted to have the surgery and stated he would consult with the clinical coordinators. Plaintiff attempted to make it clear through conversations with his providers and Defendant Neiswonger that he would need aggressive physical therapy following the surgery consistent with the specialist's recommendations and that he wanted both the surgery and physical therapy approved. In November, Plaintiff again saw the specialist and she specifically told Plaintiff that prison medical providers would not approve the necessary physical therapy following the surgery. Plaintiff again indicated that he elected to have the surgery and requested that the specialist speak with his prison physicians to assure that he would receive the necessary physical therapy.

Under NaphCare, Plaintiff did not receive the recommended occupational therapy and Neiswonger nor any other medical provider would state that Plaintiff would receive the necessary physical therapy following the surgery. Defendants argue that it was Plaintiff's "choice" to not get the surgery. But a reasonable jury could determine that this was no "choice" at all because NaphCare employees refused to guarantee that the surgery would be done in accordance with the specialist's orders and it was deliberately indifferent to Plaintiff's serious medical needs to refuse to provide Plaintiff and the specialist assurance that the surgery and therapy following surgery could be properly done before Plaintiff went forward with the surgery especially given that the specialist's orders for specific courses of therapy had been blatantly disregarded in the past.

Moreover, given the number of NaphCare employees involved in Plaintiff's care and the fact the medical providers ignored both the content of the specialist's records and Plaintiff's repeated complaints regarding that content, a reasonable jury could determine that it was NaphCare's custom to ignore specialist recommendations for non-medical reasons, and that this policy resulted in deliberate indifference to Plaintiff's serious medical needs. *See Henry v. Cnty. of Shasta*,132 F.3d 512, 521 (9th Cir. 1997) (finding a policy

more likely where multiple employees were involved in the constitutional violation). Accordingly, summary judgment will be denied as to Defendant NaphCare.

Likewise, Neiswonger has not met his burden of showing that he is entitled to summary judgment. Neiswonger does not present evidence that he lacked the authority to ensure that Plaintiff received the proper physical therapy following Plaintiff's surgery, and Plaintiff asserts that Neiswonger was aware of both his serious medical needs and the specialist's recommendations. Accordingly, on this record, summary judgment will be denied as to Defendant Neiswonger.

## 2. Medical Malpractice and Negligence

Defendants assert that Plaintiff's medical negligence claims fails because Plaintiff did not retain an expert as required by Arizona Revised Statutes § 12-561(2) and Defendants were not negligent in their treatment of Plaintiff.

### a. Legal Standard

Under Arizona law, to prove that the injury resulted from the failure of a health care provider to follow the accepted standard of care, a Plaintiff must prove that the "health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances" and that " such failure was a proximate cause of the injury." Ariz. Rev. Stat. § 12-563. "Ordinarily, a plaintiff must present expert evidence of the accepted conduct of the profession and the defendant's deviation from that standard unless the negligence is so grossly apparent that a layman would have no difficulty in recognizing it." *Nunsuch ex rel. Nunsuch v. United States*, 221 F. Supp. 2d 1027, 1032-33 (D. Ariz. 2001) (citations omitted).

### b. Tripp

As discussed above, Defendant Tripp reviewed the specialist's recommendation for surgery and referred the request to Dr. Stewart and Centurion's Utilization Management Team to determine whether surgery was appropriate. Based on these facts, no reasonable jury could determine that Defendant Tripp breached a duty of care to Plaintiff.

1  Accordingly, summary judgment will be granted in favor of Defendant Tripp as to

2  Plaintiff's medical negligence/malpractice claim in Count Three.

3       **c.**  **Stewart (Count Two) and Centurion (Count Four)**

4    Defendant Stewart argues that Plaintiff cannot establish that the decision to opt for

5  conservative management over surgical intervention was a breach of the standard of care

6  or that Defendant Stewart proximately caused Plaintiff's injuries.  Defendant Centurion

7  argues that because summary judgment is appropriate as to Plaintiff's medical

8  negligence/malpractice claims against the individual providers, it is also entitled to

9  summary judgment as Plaintiff's negligence/medical malpractice claim because it is based

10  on respondeat superior liability.

11    In this case, a reasonable jury could find that Defendant Stewart breached the

12  standard of care to Plaintiff when he did not meaningfully consider the specialist's opinion

13  that if Plaintiff did not have urgent surgery, he would suffer disfigurement and loss of

14  function in his hand, and thereafter, Plaintiff did suffer disfigurement and loss of function

15  in his hand.  A reasonable jury could conclude that it was obviously negligent to ignore

16  such an opinion and no expert testimony is necessary under the facts of this case.  *See, e.g.*,

17  *Reidhead v. Arizona*, No. CV-12-0089-PHX-JAT, 2014 WL 2861046, at *6 (D. Ariz. June

18  24, 2014) (finding that expert testimony as to a nurse's standard of care not required to

19  show negligence because a reasonable jury could conclude that any employee presented

20  with the plaintiff's symptoms of a heart attack had a duty to seek medical help and the

21  nurse breached that duty); *Cobler v. United States*, No. CV 19-00348-TUC-RM, 2022 WL

22  625710, at *6 (D. Ariz. Jan. 12, 2022) (finding it would be obvious to a layperson that

23  emergency treatment was needed for symptoms of severe stomach pain and vomiting blood

24  repeatedly); *Carranza v. Tucson Med. Ctr.*, 662 P.2d 455, 456–57 (Ariz. Ct. App. 1983)

25  (concluding that expert testimony was not required to show that a burn child sustained on

26  her leg while undergoing heart surgery could not have occurred without negligence because

27  that was within the realm of common knowledge).

28

Accordingly, summary judgment will be denied as to Plaintiff's medical negligence/malpractice claims against Defendant Stewart in Count Two and against Defendant Centurion in Count Four.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to (1) Defendants NaphCare and Neiswonger's Motion for Summary Judgment (Doc. 146), (2) Defendant Gann's Motion to Dismiss (Doc. 185), and (3) Defendants Centurion, Pippins, Stewart, and Tripp's Motion for Summary Judgment (Doc. 198).

(2)     Defendant Gann's Motion to Dismiss (Doc. 185) is **granted**.  Defendant Gann is dismissed from this action without prejudice.

(3)     Defendants NaphCare and Neiswonger's Motion for Summary Judgment (Doc. 146) is **denied**.

(4)     Defendants Centurion, Pippins, Stewart, and Tripp's Motion for Summary Judgment (Doc. 198) is **granted in part and denied in part as follows**:

> (a)     The motion is granted as to Defendants Pippins and Tripp, and Defendants Pippins and Tripp are dismissed from this action with prejudice.
>
> (b)     The Motion is otherwise denied.

(5)     The remaining claims in this action are Plaintiff's Eighth Amendment medical care claims in Count One against Defendants Centurion, NaphCare, Stewart, and Neiswonger, a state law claim for medical malpractice and negligence against Defendant Stewart in Count Two, and a state law claim for medical malpractice and negligence against Defendant Centurion in Count Four based on respondeat superior.

(6)     This action is referred to Magistrate Judge James E. Marner to conduct a settlement conference.

///

///

///

(7)    Defense Counsel shall arrange for the relevant Parties to jointly call Magistrate Judge Marner's chambers at (520) 205-4560 within 14 days to schedule a date for the settlement conference.

Dated this 10th day of September, 2025.

Honorable Sharad H. Desai
United States District Judge